UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE L. STAPLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:08CV306 JCH |
| ) | |
| JOHNS MANVILLE, INC. and ) | |
| JAY HENGES ENTERPRISES, INC., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff Lawrence L. Staples' Motion for Claim Construction, and Defendants Johns Manville and Jay Henges Enterprises, Inc.'s Opening Claim Construction Brief, both filed November 13, 2009. (Doc. Nos. 59, 61). The matter is fully briefed, and a claim construction hearing was held on January 19, 2010.

**BACKGROUND**

Plaintiff Lawrence L. Staples ("Staples" or "Plaintiff") is the owner and first named inventor of U.S. Patent No. 5,910,088, entitled "Air Infiltration Prevention in Buildings." (Plaintiff's First Amended Complaint ("Complaint" or "Compl."), Doc. No. 56, ¶¶ 1, 6, and PP. 7-10). According to the abstract, the patent provides, "[a] method for reducing air infiltration in a building having a frame constructed with wooden components," specifically by applying glue, "to abutting wooden surfaces to provide a seal between such surfaces to prevent air flow between such surfaces." (Id., P. 7).

Staples filed his original Complaint in this matter on March 5, 2008, alleging Defendant Johns Manville's Spider Custom Insulation System ("Spider System") infringed one or more claims of U.S.

1

Patent No. 5,910,088. (Doc. No. 1). Staples further alleged Defendant Jay Henges Enterprises, Inc. used, and continues to use, Johns Manville's Spider System to perform the steps of one or more of the methods claimed in U.S. Patent No. 5,910,088. (Id.).

On May 2, 2008, Johns Manville filed Reexamination Request No. 90/010,156, directed to U.S. Patent No. 5,910,088. (Compl., ¶ 8). On September 1, 2009, the United States Patent Office issued an Ex Parte Reexamination Certificate (7038th), confirming the patentability of claims 2-7 (as amended), and adding new claims 10-16. (Id., ¶ 9, and PP. 11-12).[1] Staples then filed his First Amended Complaint on November 2, 2009. (Doc. No. 56).

The parties disagree about the meaning of the following terms and phrases found in Claims 2, 4-6, and 10-16 of the '088 Patent: (1) "Glue;" (2) "Applying glue...to abutting wooden surfaces;" (3) "To seal gaps between said wooden surfaces to block air flow between such surfaces," "to provide a seal between such surfaces to block air flow between such surfaces," and "to create a seal between abutting surfaces;" (4) "Majority of abutting wooden surfaces in a building having a frame constructed from wooden frame components comprising said wooden surfaces;" (5) "At least about 85%[2];" and (6) "Applying glue to abutting wooden surfaces to...reduce air infiltration to less than 0.7 air changes per hour," and "applying glue to abutting wooden surfaces to...reduce air infiltration to less than 0.5 air changes per hour." The parties have provided some agreed definitions of terms (see Joint Claim Construction Statement, Doc. No. 45, PP. 3-4), and those agreed definitions will be used in the jury instructions to be given at trial.

Claim 2 states:

---

[1] The Court collectively refers to U.S. Patent No. 5,910,088, and the Ex Parte Reexamination Certificate as "the '088 Patent."

[2] Construction of the phrase "at least about 85%" will be considered in connection with Defendants' pending Motion for Partial Summary Judgment (Doc. No. 80).

> A method for reducing air infiltration in a building, the method comprising **applying glue to** a **majority of abutting wooden surfaces in a building having a frame constructed from wooden frame components comprising said wooden surfaces to seal gaps between said wooden surfaces to block air flow between such surfaces**, said applying of said **glue** being carried out after said frame, including trusses, floors, and exterior wall panels of the building are secured in place, and said **glue** having elastomeric properties allowing it to expand and contract as wooden surfaces to which it is applied expand and contract, and wherein said wooden frame components comprise plates, double plates, double studs, studs, headers, wall frames, subfloors, exterior wall plates, bandboards, subfloors, and two-by-fours.

('088 Patent, Ex Parte Reexamination Certificate, P. 12, Col. 1, ll. 27-42) (emphasis added). Claim 4 states:

> The method of [amended] claim **2** including applying **glue to create a seal between abutting surfaces** at the following abutting surfaces: double plates, double studs, studs and headers, corner surfaces of wall frames, subfloors and exterior wall plates, bandboard surfaces and subfloors, bandboards and plates, and two-by-fours.

('088 Patent, P. 10, Col. 4, ll. 17-22) (emphasis added). Claim 5 states:

> The method of claim **4** wherein **glue** is applied to **at least about 85%** of said abutting surfaces in the building.

(Id., ll. 23-24) (emphasis added). Claim 6 states:

> A method for reducing air infiltration in a building, the method comprising **applying glue to** a **majority of abutting wooden surfaces in a building having a frame constructed from wooden frame components comprising said wooden surfaces to seal gaps between said wooden surfaces to block air flow between such surfaces**, said applying of said **glue** being carried out after said frame, including trusses, floors, and exterior wall panels of the building are secured in place, and said **glue** having elastomeric properties allowing it to expand and contract as wooden surfaces to which it is applied expand and contract, wherein said applying **glue** comprises:
>
>> applying **glue to create a seal between abutting surfaces** of wooden components forming double plates of wall panels;
>>
>> applying **glue to create a seal between abutting surfaces** of wooden components of double studs supporting window and door headers;
>>
>> applying **glue to create a seal between abutting surfaces** of wooden wall panels forming corners; and

3

> applying **glue to create a seal between abutting surfaces** at subfloors and where subfloors meet exterior wall plates.

('088 Patent, Ex Parte Reexamination Certificate, P. 12, Col. 1, ll. 43-65) (emphasis added). Claim 10 states:

> A method for reducing air infiltration in a building, the method comprising **applying glue to** a **majority of abutting wooden surfaces in a building having a frame constructed from wooden frame components comprising said wooden surfaces to seal gaps between said wooden surfaces to block air flow between such surfaces**, said applying of said **glue** being carried out after said frame, including trusses, floors, and exterior wall panels of the building are secured in place, and said **glue** having elastomeric properties allowing it to expand and contract as wooden surfaces to which it is applied expand and contract, and wherein said wooden frame components comprising said wooden surfaces comprise two-by-fours and studs.

(Id., Col. 2, ll. 23-35) (emphasis added). Claim 11 states:

> A method for reducing air infiltration to less than about 0.7 air changes per hour in a residence having a frame comprising wooden components, the method comprising **applying glue to abutting wooden surfaces to provide a seal between such surfaces to block air flow between such surfaces** and **reduce air infiltration to less than about 0.7 air changes per hour**, wherein the **glue** has elastomeric properties allowing it to expand and contract as wooden surfaces to which it is applied expand and contract.

(Id., Col. 2, ll. 36-44) (emphasis added). Claim 12 states:

> A method for reducing air infiltration to less than about 0.5 air changes per hour in a residence having a frame comprising wooden components, the method comprising **applying glue to abutting wooden surfaces to provide a seal between such surfaces to block air flow between such surfaces** and **reduce air infiltration to less than about 0.5 air changes per hour**, wherein the **glue** has elastomeric properties allowing it to expand and contract as wooden surfaces to which it is applied expand and contract.

(Id., Col. 2, ll. 45-53) (emphasis added). Claim 13 states:

> The method of claim 11 wherein the **glue** is applied to a **majority of the abutting wooden surfaces** in the residence.

(Id., Col. 2, ll. 54-55) (emphasis added). Claim 14 states:

> The method of claim 12 wherein the **glue** is applied to a **majority of the abutting wooden surfaces** in the residence.

4

(Id., Col. 2, ll. 56-57) (emphasis added). Claim 15 states:

> The method of claim 12 wherein said applying **glue** to abutting wooden surfaces comprises applying **glue** to abutting boards.

(Id., Col. 2, ll. 58-60) (emphasis added). Claim 16 states:

> The method of claim 11 wherein said applying **glue** to abutting wooden surfaces comprises applying **glue** to abutting boards.

(Id., Col. 2, ll. 61-63) (emphasis added).

## LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

Claim construction is a matter of law reserved for the courts. Markman v. Westview Instruments, Inc., 517 U.S. 370, 387, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). When determining the correct claim construction, the Court follows the "bedrock principle" that the "claims of a patent define the invention" that the patentee owns. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotations and citations omitted), cert. denied, 546 U.S. 1170 (2006). As such, the Court may neither add nor subtract words from the claims while construing them. Id. The words in the claim are "generally given their ordinary and customary meaning." Phillips, 415 F.3d at 1312 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1313 (citations omitted). The patentee may act as his own lexicographer, however, and give terms a meaning other than their ordinary meaning, so long as the special definition is "clearly stated in the patent specification or file history." Vitronics, 90 F.3d at 1582 (citations omitted).

When engaging in claim construction, the Court first looks to the "intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics, 90 F.3d at 1582 (citation omitted). The claims themselves provide "substantial

guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314 (citations omitted). Context, for example, can provide important clues about the meaning of certain words within the claim. See id. (explaining that term "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Similarly, because terms are "normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id. (citations omitted).

Because claims are part of a "fully integrated written instrument," they must "be read in view of the specification, of which they are a part." Markman v. Westview Instruments, Inc., 52 F.3d 967, 978, 979 (Fed. Cir. 1995) (citations omitted). The Federal Circuit has emphasized repeatedly that the specification "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582). The Court must not, however, import limitations from the specification into the claim. Phillips, 415 F.3d at 1323. Rather, claim terms take on their ordinary and customary meaning "unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002). Thus, the Court must interpret the claims in light of the specification, but avoid impermissibly importing limitations from the specification into the claims. Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).

The Federal Circuit has instructed that the Court "should also consider the patent's prosecution history, if it is in evidence." Phillips, 415 F.3d at 1317 (internal quotations and citations omitted). The prosecution history consists of "the complete record of the proceedings before the

PTO [Patent Trade Office] and includes the prior art cited during the examination of the patent." Phillips, 415 F.3d at 1317 (citation omitted). The prosecution history has value because it "provides evidence of how the PTO and the inventor understood the patent." Id. (citation omitted). The prosecution history can clarify the meaning of the claim terms by demonstrating how the inventor understood his invention, and "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. (citations omitted). Because the patent history reflects the ongoing negotiations between the PTO and the inventor, however, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317 (citations omitted).

Finally, the Court also may look to extrinsic evidence, such as expert testimony, dictionaries, and learned treatises. MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1329 (Fed. Cir. 2007). This evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language," however. Phillips, 415 F.3d at 1317 (internal quotations and citations omitted). Thus, a Court may use a dictionary to understand the ordinary meaning of claim terms "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1305 (Fed. Cir. 2005) (internal quotations and citations omitted).

## SPECIFIC CLAIMS DISPUTES

1. **"Glue"**

Staples defines "glue" as a "substance used as an adhesive to bind or join materials." (Joint Claim Construction Statement, P. 1). Defendants define it as a, "substance that binds wooden frame components and seals gaps between them." (Id.). Defendants contend that the repeated references

7

to wooden frame components and sealing gaps throughout both the specification and the claims warrant such a construction.

Upon consideration, the Court will not adopt Defendants' definition, because it unnecessarily incorporates other requirements from the claims into the definition of "glue" itself. In other words, Defendants ask the Court to define "glue" not based on what glue is, but rather on their interpretation of the manner in which it must be used and the purposes it must serve under the terms of the patent. This the Court declines to do. Instead, because "glue" apparently is defined in neither the patent nor the prosecution history, the Court looks to extrinsic evidence to provide assistance. Staples notes the Concise Oxford English Dictionary defines "glue" as, "an adhesive substance used for sticking objects or materials together." (See Doc. No. 60-5, P. 4). Further, the Means Illustrated Construction Dictionary defines "glue" as, "a general term for any natural or synthetic viscous or gelatinous substance used as an adhesive to bind or join materials." (See Doc. No. 60-6, P. 4). The Court finds Staples' proposed definition of "glue" as a, "substance used as an adhesive to bind or join materials" appropriately synthesizes the two definitions, and so adopts it here. See Phillips, 415 F.3d at 1314 (citation omitted) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful.").

**2.      "Applying glue...to abutting wooden surfaces"**

Staples defines "applying glue...to abutting wooden surfaces" as "applying an adhesive to touching wooden surfaces that are susceptible to outside air infiltration." (Joint Claim Construction Statement, P. 1). Defendants generally agree with Staples' definition, so long as the adhesive is applied, "prior to the installation of insulation." (Id.).

8

Upon consideration, the Court will not adopt Defendants' definition, because it "will not at any time import limitations from the specification into the claims." Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1362 (Fed. Cir. 2007) (internal quotations and citations omitted). Defendants' construction attempts to do just that. In other words, although the specification at times appears to impose a temporal restriction (see, e.g., '088 Patent, P. 9, Col. 2, ll. 2-4, P. 10, Col. 3, ll. 7-9), the claims themselves do not. Furthermore, the specification itself states as follows: "As various changes could be made in the above embodiments without departing from the scope of the invention, it is intended that all matter contained in the above description shall be interpreted as illustrative and not in a limiting sense." (Id. at Col. 3, ll. 53-56). The Federal Circuit has refused to import limitations from the specification when nearly identical language was used. See Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284, 1290 (Fed. Cir. 2006), cert. denied, 549 U.S. 1328 (2007). Accordingly, the Court will adopt Staples' construction, and define "applying glue...to abutting wooden surfaces" as "applying an adhesive to touching wooden surfaces that are susceptible to outside air infiltration."

3. **"To seal gaps between said wooden surfaces to block air flow between such surfaces," "to provide a seal between such surfaces to block air flow between such surfaces," and "to create a seal between abutting surfaces"**

Staples maintains there is no need for the Court to construe the above phrases, as they may be afforded their plain meaning. (Joint Claim Construction Statement, P. 2). Defendants request that the phrases be interpreted as follows: "To fill gaps between the abutting surfaces of a wooden frame along the surfaces' length of contact such that the applied glue blocks the flow of air between such surfaces." (Id.).

Upon consideration, the Court rejects Defendants' proposed definition, as it is incongruous with the language of the specification. Specifically, the Court notes that nowhere in the specification or claims does it state the glue is meant to "fill" the gaps. Rather, the specification and claims

9

consistently maintain the glue will *seal* the gaps, and even contrast this sealing with the prior practice of using caulk to fill the gaps. (See, e.g., '088 Patent, P. 9, Col. 1, ll. 12-17, 56-61). Defendants' proposed construction thus is not supported by the intrinsic evidence, and the Court will not adopt it here.

4. **"Majority of abutting wooden surfaces in a building having a frame constructed from wooden components comprising said wooden surfaces"**

Staples defines "majority of abutting wooden surfaces in a building having a frame constructed from wooden components comprising said wooden surfaces" as "more than half of the abutting length of the touching wooden surfaces that are susceptible to outside air infiltration." (Joint Claim Construction Statement, P. 2). Defendants define it as "more than 50% of the total abutting length of all of the touching wooden surfaces in a building frame that are susceptible to outside air infiltration." (Id.).

Upon consideration, the Court sees little difference between the parties' proposed constructions. In other words, although Staples claims Defendants "want the Court to require that the glue be applied to the majority of all the abutting wooden surfaces in a building--*including abutting surfaces on the interior of a building that have no bearing on air infiltration*" (Doc. No. 60, P. 13 (emphasis added)), the Court finds no such limitation in Defendants' proposed construction.[3] The Court will adopt Defendants' definition, as it is more precise, and more accurately reflects the teachings of the patent as found in the specification and claims.

5. **"Applying glue to abutting wooden surfaces to...reduce air infiltration to less than 0.7/0.5 air changes per hour"**

---

[3] To the contrary, Defendants' construction specifically addresses only those wooden surfaces "that are susceptible to outside air infiltration."

Claim 11 states in relevant part as follows: "A method for reducing air infiltration to less than about 0.7 air changes per hour in a residence having a frame comprising wooden components, the method comprising applying glue to abutting wooden surfaces to provide a seal between such surfaces to block air flow between such surfaces and reduce air infiltration to less than about 0.7 air changes per hour."[4] ('088 Patent, Ex Parte Reexamination Certificate, P. 12, Col. 2, ll. 36-42). Staples requests the following construction of the disputed phrase: "Lower the number of air changes per hour to a value lower than approximately 0.7 [or 0.5]." (Joint Claim Construction Statement, P. 2). Defendants construe the phrase as follows: "Application of the glue to abutting wooden surfaces alone causes the air changes per hour to drop from a value above 0.7 [or 0.5] to below 0.7 [or 0.5]." (Id.). The differences in the parties' construction thus hinge on whether the air changes per hour must be greater than 0.7/0.5 before the glue is applied, and whether there must be a nexus between the application of the glue and the reduction of air infiltration to the specified levels.[5]

Upon consideration, the Court will adopt Defendants' proposed construction. Specifically, the Court finds the claim language itself requires that air infiltration be *reduced* to a level less than about 0.7/0.5 air changes per hour. Implicit within that language is the requirement that the level be *greater than* 0.7/0.5 air changes per hour before the application of glue. Furthermore, the claims language, the specification, and the prosecution history all support the notion that a nexus must exist

---

[4] The language in Claim 12 is identical to that in Claim 11, except that it requires a reduction of air infiltration to "less than about 0.5 air changes per hour." ('088 Patent, Ex Parte Reexamination Certificate, P. 12, Col. 2, ll. 45-51).

[5] In their claim construction brief, Defendants further maintain the intrinsic evidence, "makes clear that air changes per hour is not an estimate or predicted value, but is a value that is actually demonstrated, such as through a blower door test." (Doc. No. 61, P. 19). Upon consideration, the Court finds it need not decide this issue, as such a requirement is found nowhere in Defendants' proposed construction of the phrase at issue.

between the application of the glue and the reduction of air infiltration. Defendants' proposed construction thus more accurately reflects the teachings of the patent, and will be adopted here.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the disputed terms in U.S. Patent No. 5,910,088 will be construed as set forth in this Memorandum and Order.

Dated this <u>16th</u> day of March, 2010.

/s/ Jean C. Hamilton  
UNITED STATES DISTRICT JUDGE